UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS AMERICA, INC., | ) ) ) | CASE NUMBER: 5:09CV1575 |
| Plaintiff, | ) ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) | Magistrate Judge George J. Limbert |
| DANIEL BRANCH, et al., | ) ) ) ) ) | **Interim Report and Recommendation Regarding Plaintiff Hitachi Medical Systems America, Inc.'s Motion for Summary Judgment and Defendant David Branch's Motion for Partial Summary Judgment** |
| Defendants. | ) | |

This matter is before the Court on a motion for summary judgment filed by Plaintiff, Hitachi Medical Systems America, Inc. ("Hitachi") as to Defendant David Branch ("David"). (ECF Dkt. #284.) No opposition brief was filed by David, who is acting pro se, as a result of a Memorandum of Opinion and Order issued by this Court on April 5, 2011, which reads, in pertinent part, "Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii), Defendant David Branch is prohibited from supporting or opposing all claims or defenses and from introducing any evidence in the case at bar." (ECF Dkt. #295, Memorandum of Opinion and Order, p. 11.)

Also before the Court is the motion for partial summary judgment filed by Defendant David Branch filed on June 8, 2010. (ECF Dkt. #97.) On March 15, 2011, with leave of court, Hitachi filed its opposition brief. (ECF Dkt. #282.) Then, on April 5, 2011, the Court entered the Memorandum of Opinion and Order prohibiting David from supporting or opposing all claims or defenses and from introducing any evidence in the case at bar. Based upon the Court's order, the undersigned recommends that the Court deny David's motion for summary judgment as moot.

Plaintiff's motion seeks dispositive relief. Therefore, the undersigned issues the following report and recommendation for Judge Pearson's review, with the ultimate recommendation that the Court deny the motion for summary judgment.

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party. *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496. 498 (6th Cir.1990). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202). In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251.

Hitachi is a Delaware corporation with its principal place of business in Twinsburg, Ohio. Hitachi sells and services Magnetic Resonance Imaging (MRI) equipment. Defendant Daniel Branch ("Daniel") was a shareholder and Chief Financial Officer of Horizon Medical Group, Inc. ("Horizon Medical") at all times relevant to the complaint. Defendant David Branch ("David") was a shareholder and Chief Executive Officer of Horizon Medical at all times relevant to the complaint. Defendant, Martin Kern ("Kern") was a shareholder and officer of Horizon Medical at all times relevant to the complaint.

Horizon Medical is a management company that provided accounting, personnel, billing and collection services to numerous MRI centers owned and operated by numerous affiliated limited liability companies ("the LLCs"). (ECF Dkt. #285, Deposition of Daniel Branch (January 14, 2009), pp. 7-8.) The ownership of Horizon Medical was at all times relevant to the above-captioned case: David, 33%, Daniel, 20%, Kern, 15%, Barry Steinberg, 15%, Mike Brown, 7%, Dan Hansen, 7%, and Mike Lacenere, 3%. (ECF Dkt. #80-1, Affidavit of Martin Kern, ¶3.) The LLCs were owned by Med Fund, LLC and JFB Holdings, Inc. ("JFB Holdings") (ECF Dkt. #85, Deposition of Daniel Branch (May 15, 2008), p. 30.)

In addition to JFB Holdings' joint ownership of the LLCs with Med Fund, JFB Holdings also owned 65% of Med Fund. Id. at 30. The owners of the other 35% of Med Fund were not identified in the record. The ownership structure of Horizon Medical and JFB Holdings are identical, and, as

-2-

a consequence, Defendants are majority shareholders of JFB Holdings. Id. at 31.

In 2002, 2003, and 2004, Horizon Medical entered into four-year service agreements with Hitachi for the servicing and repair of the equipment at the various MRI centers. (ECF Dkt. # 41-1, Affidavit of Richard Katz, ¶3.) Beginning in 2004, Horizon Medical stopped paying the monthly service fees. (ECF Dkt. # 41-1, Katz Aff. ¶6.) On July 9, 2007, Hitachi filed a civil action asserting breach of contract, unjust enrichment, and detrimental reliance claims against Horizon Medical and the LLCs, and a fraud claim against the Branches. See *Hitachi Medical Systems America, Inc. v. Horizon Medical Group, et al.*, 5:07CV2035 (the breach of contract/unjust enrichment case). Hitachi alleged that the Branches fraudulently induced Hitachi to enter into the service contracts by misrepresenting Horizon Medical's ability to pay under the contracts. Hitachi further alleged that, after Horizon Medical stopped paying the monthly service fees and Hitachi refused to perform under the contracts, the Branches fraudulently induced Hitachi to resume service. Hitachi filed an amended complaint on November 29, 2007, which restated the claims in the original complaint, but also sought to pierce the corporate veil of Horizon Medical based upon the fraud claims asserted against the Branches.

On October 13, 2008, Judge Lioi entered summary judgment in favor of the Branches citing a failure on the part of Hitachi to demonstrate fraud. (5:07CV2035, ECF Dkt. #191, Memorandum Opinion and Order, p. 24.) It appears from the pleadings in that case that Hitachi believed that it could still pursue the veil piercing remedy based upon the breach of contract and unjust enrichment claims. On October 29, 2008, Judge Lioi issued a memorandum opinion and order in which she concluded that the remaining claims in the amended complaint represented "basic example[s] of unjust conduct" and could not be used to justify piercing the corporate veil to permit Hitachi to pursue individual liability against the Branches. (5:07CV2035, ECF Dkt. #216, Memorandum Opinion and Order, p. 5, quoting *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538.) In *Dombroski*, the Ohio Supreme Court recognized that, in order to pierce the corporate veil, a plaintiff must demonstrate that "control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity." *Dombroski, supra,* at

-3-

paragraph three of the syllabus.

Despite the dismissal of the fraud claims against the Branches, Judge Lioi observed, in dicta, that a successful fraudulent conveyance claim could demonstrate the requisite fraud for the veil piercing theory of liability:

> In [Hitachi's] only colorable argument with respect to piercing the corporate veil, [Hitachi] argues that a veil-piercing claim could be appropriate if the Branches fraudulently transferred the Horizon entities' assets in order to avoid payment of creditors. A fraudulent conveyance claim, if successfully proved, likely could sustain a claim for piercing the corporate veil under [Ohio law.]

(5:07CV2035, ECF Dkt. #216, Memorandum Opinion and Order, p. 5.)[1] Hitachi raised the fraudulent conveyance allegations in a motion to compel discovery. Because Hitachi did not seek to amend its complaint to add a fraudulent conveyance claim, Judge Lioi ultimately denied the motion to compel because the discovery sought by Hitachi was not relevant to the remaining breach of contract and unjust enrichment claims. Id. at p. 7.

On November 10, 2008, Judge Lioi entered a judgment in favor of Hitachi and against Horizon Medical on the breach of contract claim in the amount of $2,823,783.80, and judgments in favor of Hitachi and against the LLCs totaling $462,375.71 ("the 2008 judgments"). 5:07CV2035, ECF Dkt. #251, 252. The 2008 judgments remain unpaid. (ECF Dkt. # 41-1, Katz Aff. ¶12.)

The complaint in this case was filed on July 9, 2009. Hitachi asserts that Horizon Medical and the LLCs were rendered judgment-proof as a result of several fraudulent asset transfers executed

---

[1] In *Waste Conversion Technologies, Inc. v. Warren Recycling, Inc.*, 141 Fed.Appx. 429, 2006 WL 2188709 (6th Cir.2006, unpublished), the Sixth Circuit observed that, in Ohio, fraudulent transfer claims "do not rise to the level required to pierce the corporate veil." Id. at 434. The Sixth Circuit reasoned:

> Fraudulent conveyance law is more carefully tailored to the interests of all parties than the blunt instrument of piercing the corporate veil, which, for instance, could permit recovery against the new party defendants beyond any amounts that were fraudulently transferred. The general remedy in a fraudulent conveyance permits the creditor to recover the value of the asset transferred or the amount necessary to satisfy the creditor's claim, whichever is less. See Ohio Rev.Code § 1336.08(B)(1). The remedy in fraudulent conveyance stands in contrast with the general remedy in veil piercing. When the corporation's veil is pierced, the individual shareholders are liable for all of the corporation's debts, which could exceed the value of the assets fraudulently conveyed. See *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 348 (7th Cir.2004) (shareholders are jointly and severally liable once the veil is pierced).

"by and to the Defendants"[2] between 2005 and 2008, and seeks to pierce the corporate veil of Horizon Medical and JFB Holdings[3] based upon the evidence of fraud, in order to recover the 2008 judgments personally from Daniel,[4] David, and Kern. (ECF Dkt. #284, Hitachi's Motion for Summary Judgment, p. 3.) Although Hitachi asserts that the Defendants controlled Med Fund and the LLCs, it is important to note that Hitachi does not seek to pierce the corporate veil of Med Fund, nor does it seek to pierce the corporate veil of the LLCs.

In order to pierce the corporate veil in this case, Hitachi must demonstrate, among other things, that control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity. *Dombroski, supra.* As the undersigned recognized in the interim report and recommendation on the motion for preliminary injunction, "Hitachi may not recover damages merely on a showing of corporate alter ego or veil piercing; [Hitachi] must establish a tenable cause of action along with these theories. The only stand alone claims that [Hitachi] has stated are for

---

[2] It is not clear from the pleadings whether the Defendants are named personally or as alter egos of Horizon Medical, or both. A corporate officer can be held personally liable for tortious acts he or she has committed without the necessity of corporate veil piercing. *Mohme v. Deaton,* 12th Dist. No. CA2005-12-133, 2006-Ohio-7042, ¶9, citing *Dehoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, 10th Dist. No. 02AP-454, 2003-Ohio-3334, ¶ 89-90 (a corporate officer's individual liability for torts personally committed is distinct from the liability resulting from the 'piercing of the corporate veil'); See also *Yo-Can, Inc. v. The Yogurt Exchange, Inc.* (2002), 149 Ohio App.3d 513, 2002-Ohio-5194, 778 N.E.2d 80, 90 (distinguishing corporate law and the law of agency).

"When a corporate officer commits a tort while in the performance of his duties, he is individually liable for the wrongful act." *Lambert v. Kazinetz*, 250 F.Supp.2d 908, 914-915 (S.D.Ohio 2003). A defendant cannot shield himself from liability for the conduct in which he allegedly engaged merely because he engaged in that conduct as a corporate officer, and the fact that a plaintiff may not be able to pierce the corporate veil is irrelevant to the issue. Id.

[3] The Complaint reads, in pertinent part, "The corporate veils of Horizon [Medical] and JFB Holdings should be pierced, and Defendants should be held individually and personally liable for the fraud, illegal acts, and/or similarly unlawful acts, including all fraudulent transfers, alleged herein." (ECF Dkt. #1, Complaint, ¶45.)

[4] On April 5, 2011, the Court entered default judgment on the fraudulent transfer claims against Defendant Daniel Branch and authorized Hitachi to pierce the corporate veil with respect to Daniel, pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi), as a sanction for his willful failure to provide discovery throughout the pendency of this case. (ECF Dkt. #295.)

fraudulent transfer."  (ECF Dkt. #173, Interim Report and Recommendation (on the motion for preliminary injunction),  p. 21.)  In other words, Hitachi has not asserted a general fraud claim against the Defendants, and, therefore, the veil piercing remedy in this case is predicated solely upon the fraudulent transfer claims.

Hitachi discovered the lion's share of the following evidence, which it offers in support of the fraudulent transfers claims, during the examination of the judgment debtor, Horizon Medical, which was conduced during the post-judgment phase of the breach of contract/unjust enrichment case.  Daniel testified on behalf of Horizon Medical at the debtor's examination.

Pursuant to an agreement between Horizon Medical and the LLCs, Horizon Medical received a management fee equivalent to 20% of the monthly "net MRI revenue collected before expenses" generated by the MRI centers in exchange for accounting, personnel, billing, and collection services provided to the various LLCs.  (ECF Dkt. #285, Deposition of Daniel Branch (1/14/2009), p. 56.) The management fee constituted Horizon Medical's sole income.  Id. at p. 56.   From the management fee, Horizon Medical paid, among other things, the officers' salaries, and the LLCs' federal taxes.  Id. at p. 51, 53, 76-77.  Med Fund was a holding company for the LLCs.  Id., p. 48. Daniel explained that all of the insurance contracts were executed with Med Fund, so all of the money from the insurance companies would go to Med Fund.  Id. at p. 50.

As of January 14, 2009, the last federal tax return filed on behalf of Horizon Medical was for 2004.  Id. at p. 38.  In 2004, the MRI business suffered a downturn, which Daniel attributed to Hitachi and General Electric.  He claimed that Hitachi and General Electric had saturated the market with MRI machines, thereby driving down reimbursements.  Id. at p. 99.  Daniel alleged that Hitachi used the monthly maintenance service to surreptitiously determine the number of scan performed at each MRI center.  He further alleged that a pattern developed, where, if a particular MRI center generated a high volume of scans, a new MRI center would open nearby with Hitachi equipment.

Ten of the MRI centers owned by the LLCs were closed at some point in 2005.  According to Daniel, around the same time "we basically shut Horizon [Medical] down and then, you know,

-6-

kind of streamlined the operations into Med Fund[5], you know, as the reimbursements continued to dip in the MRI business." (ECF Dkt. #286, Deposition of Daniel Branch, p. 80, 82.) Horizon Medical's management fee contract was canceled, Id. at p. 82, and Med Fund assumed Horizon Medical's management responsibilities for the LLCs. (ECF. Dkt. #285, Deposition of Daniel Branch, p. 31.) The management responsibilities assumed by Med Fund are not clear from the record, because Daniel stated that "[we]* * *outsourced a lot of our operations at that time. We did outsource payroll. We outsourced billing, anything to save money to try to keep it together." (ECF. Dkt. #286, Deposition of Daniel Branch, p. 80.) Adding to the confusion, neither of the Branch brothers nor Kern could identify the individual responsible for maintaining the corporate records for Horizon Medical. (ECF. Dkt. #285, Deposition of Daniel Branch (1/14/2009), p. 11.)

Despite "basically shut[ting] Horizon [Medical] down" in 2005, entries in the general ledger for the company, which was not offered as an exhibit for summary judgment purposes, continued through July 31, 2007. (ECF. Dkt. #286, Deposition of Daniel Branch, p. 80.) According to Daniel, the general ledger at issue "technically probably is Med Fund." Id. at p. 83. Daniel claimed that he was forced to reduce the accounting staff from ten to three at that time, and "well, such things as changing the heading on the general ledger just didn't get done." Id. at p. 80-81. He stated, "That's why I have to go back now and kind of clean up [Horizon Medical], and you know, get it all organized and finalized." Id. at p. 81.

When asked whether Med Fund assumed responsibility for Horizon Medical's financial obligations, Daniel responded, "No, because there wouldn't be because [Horizon Medical] was basically money in, money out. I mean, there wasn't any long term obligations on [Horizon Medical] except for the car leases – which they would assume – but other than that, the bills would have all been paid and [Horizon Medical's] book would all be closed." Id. at p. 83. The "car leases" refer to leases for a Lexus (Daniel), and two Porsches (David and Mike Brown), which Daniel characterized as "the one perk the officers did have is they made one – they had a car paid for." Id. at ¶86. He stated that not all of the officers took advantage of the perk. Id. at p. 87.

---

[5]Hitachi does not allege that Med Fund is the successor of Horizon Medical.

-7-

The car payments are reflected on Horizon Medical's general ledger. The ledger also reflects a $68,366.66 payment on January 24, 2006 to the Tampa Bay Buccaneers for a luxury suite, which Daniel claims was returned to the company the following year. Id. at p. 92. The ledger includes "large payments" to Cure, SE, a company which serviced the MRI machines after Horizon Medical breached their contracts with Hitachi, Id. at ¶94, and a $39,581.75 payment on February 1, 2006 to Jet Sales and Service, which Daniel claimed was not a debt of Horizon Medical or Med Fund. Id. at p. 92, 96. It is not clear from the record whether the foregoing expenditures were debts of Horizon Medical or Med Fund or one or more of the individual shareholders.

Numerous payments to shareholders are also reflected in Horizon Medical's general ledger:

> January 6, 2006:
>
> -$110,000 to Martin Kern
> -$15,000 to Daniel
> -$10,000 to David
> -$5,000 to Michael Lacenere
>
> January 9, 2006:
>
> -$10,000 to Daniel
> -$10,000 to David
>
> January 12, 2006:
>
> -$80,000 to Martin Kern
>
> March 2, 2006:
>
> -$160,000 to Martin Kern

Id. at p. 90-98.

> March 6, 2006:
>
> -$10,000 to David
> -$70,000 to Kern
>
> March 13, 2006:
>
> -$5,000 to Mike Brown
> -15,000 to Daniel
> -$15,000 to David

(ECF Dkt. #286, Deposition of Daniel Branch (February 18, 2009), pp. 96-97.)

Although Daniel conceded that "there was a lot of money in and a lot of money out at that

-8-

particular time," he claimed that the foregoing transfers to shareholders constituted repayment of loans made by the shareholders to cover payroll expenses. Id. at p. 56. Daniel claimed that the loans were not memorialized because they were short term loans and "[y]ou would hopefully get the money back." (ECF Dkt. #285, Deposition of Daniel Branch (January 14, 2009), p. 86.)

Based upon Daniel's testimony that Horizon Medical was shut down in 2005, and that any remaining Horizon Medical employees became employees of Med Fund, the short-term payroll loans would have been made to Med Fund, not Horizon Medical, but the "loan repayments" were made from the Horizon Medical ledger. According to Daniel, the Horizon Medical ledger was the Med Fund ledger, which is consistent with his testimony that "the officers – if we could take anything out of Med Fund, we did; but usually we were putting money in there. In the end, that's why we sold the company." Id. at p. 82.

Daniel testified that Horizon Medical was not profitable, it lost money every year it was in business, and the company did not generate sufficient income to pay its obligations on a regular basis. Id. at p.8, 17-18, 38-39, 44. According to Kern, Horizon Medical did not declare or pay dividends from 2004 to the present. (Dkt. #281-3, Responses to Plaintiff's First Request for Admissions, First Set of Interrogatories, and First Requests for Production of Documents Propounded upon Defendant Martin Kern, p. 8.)

On May 16, 2009, Consolidated Healthcare Services ("Consolidated") purchased the assets of the 31 LLCs for $13,821,000. (ECF Dkt. #24-6, Asset Purchase Agreement ("APA"), p. 6 (SEALED)). Hitachi claims that Consolidated also purchased the assets of Med Fund (and, therefore, the assets of Horizon Medical), but Med Fund is listed as an owner, not an asset seller, in the APA. The owners identified in the contract were Med Fund, JFB Holdings, Davis Diagnostics, LLC, Horizon Crossings, LLC, David, and the other 30[6] LLCs. Id., p. 4, 34-46. The asset sellers identified were the 31 LLCs. However, according to Daniel, the insurance contracts that were negotiated with Med Fund were transferred in the APA. (ECF Dkt. #286, Deposition of Daniel Branch (2/18/09), p. 19).

---

[6]Davis Diagnostics, LLC is listed as both an owner and an asset seller.

David negotiated the terms of the APA and signed the agreement on behalf of the owners. The APA provides several pre-conditions to closing, including consents and resolutions signed by Kern, David and Daniel "being (1) the authorized officers and directors of the Owners and (2) being the authorized managers or managing members of a majority interest of the Owners, approving this Agreement in form and substance satisfactory to the Purchasers." (ECF Dkt. #24-6, Asset Purchase Agreement, p. 10. (SEALED)).

Although $11,321,000 of the purchase price was specifically earmarked in the APA for the satisfaction of debts to several financial institutions (GE Capital, $2,500,000; Lyon Financial Services, Inc., $4,500,000; CNL Bank, $937,000; Bank of Texas/Oklahoma, $384,000) as well as a debt to G&S, GP, LLC for $3,000,000, the potential debt to Hitachi was not acknowledged in the APA. Id. at p. 6. According to Daniel, he and David were guarantors on one or more of the debts referenced in the APA, however, he did not identify the debts that he and/or David personally guaranteed. (ECF Dkt. #286, Deposition of Daniel Branch (2/18/09), p. 21.) The remainder of the purchase price was divided into two payments: (1) $1,500,000 to the owners' legal counsel trust account for distribution to Med Fund, and (2) 1,000,000 to Med Fund ($100,000 per month for ten months following the closing date).

David received $490,000 by way of a wire transfer that was dated May 21, 2008. (ECF Dkt. #107-7, Wire transfer to David Branch from Harry W. Haskins PA.) Kern received $250,000 by way of a check written on Harry W. Haskins' trust account. (ECF Dkt. #107-10, Check to Martin Kern from Trust Account of Harry W. Haskins PA.) Hitachi alleges that Daniel received $350,000 by way of two wire transfers to one of his companies, KRB Enterprises, but did not cite to any evidence in the record to show that KRB Enterprises was owned by Daniel. (ECF Dkt. #107-8, 107-9, Wire transfers to KRB Enterprises from Harry W. Haskins PA.)

The day before the APA was executed, Daniel provided deposition testimony in the breach of contract/unjust enrichment action, where he was asked if Horizon Medical was "currently operating." (Dkt. #85, Deposition of Daniel Branch (May 15, 2008), p. 8.) He responded, "Yes." Id. He explained that Horizon Medical "manages all the centers, it gets a fee from the centers for management," and that he "handle[s] all financial activity for the company." Id. Daniel further

-10-

testified that Horizon Medical had twenty-five employees, and that it provided "[t]ranscription, billing, collection, personnel, accounting, [and] overall management" for the MRI centers. Id. at p. 21.

Judge Lioi concluded in the breach on contract/unjust enrichment action that Daniel's 2008 testimony constituted common law fraud. In that case, Hitachi originally named Med Fund as a defendant. Hitachi voluntarily dismissed Med Fund pursuant to Fed. R. Civ. P. 41(A)(1) with prejudice on November 6, 2008. (ECF Dkt. #243.) After Daniel's 2009 depositions, Hitachi filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b). (ECF Dkt. #285.) Hitachi argued that it had voluntarily dismissed its claim against Med Fund based upon Daniel's fraudulent 2008 testimony that Horizon Medical was a going concern at that time. Judge Lioi granted the motion for relief from judgment, writing:

> [Daniel] clearly misrepresented a material fact by claiming that [Horizon Medical] was operating as a going concern during 2008, when, in reality, it had ceased operations approximately three years earlier. This misrepresentation was made with the intention of inducing Hitachi's detrimental reliance – perhaps not for the specific purpose of obtaining a dismissal with prejudice of Med Fund (since that specific event was not a direct subject of conversation during Branch's 2008 deposition), but certainly for the purpose of obscuring the location of the Horizon Medical] entities' assets and to trick Hitachi into pursuing the judgment-proof [Horizon Medical], rather than the asset-laden Med Fund.

(ECF Dkt. #290, Memorandum and Opinion, pp. 5-6.)

Turning to the substantive claims in this case, Ohio's Uniform Fraudulent Transfer Act was enacted to create a right of action for a creditor to set aside an allegedly fraudulent transfer of assets. *Sanderson Farms, Inc. v. Gasbarro*, 10th Dist. No. 01AP-461, 2004-Ohio-1460, at ¶40. The Act defines certain types of transfers from a debtor to a transferee as fraudulent. See R.C. 1336.04(A) & R.C. 1336.05. If a transfer is fraudulent, then a creditor has the right to sue the original transferee, any subsequent transferee, or any person who benefitted from the transfer for the value of the transferred property, subject to certain defenses. R.C. 1336.08.

There are three ways in which Hitachi can prove that the transfers were fraudulent: (1) proving the debtor actually intended to hinder, delay, or defraud any creditor, R.C. 1336.04(A)(1); (2) proving that the debtor did not receive reasonably equivalent value and either that the debtor's remaining assets of the debtor were unreasonably small or that he would not be able to pay his debts

-11-

as they became due, R.C. 1336.04(A)(2); or, (3) proving that the debtor did not receive reasonably equivalent value and that the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer, R.C. 1336.05(A).

More specifically, R.C. 1336.04(A)(1) provides that "[a] transfer made * * * by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made * * * if the debtor made the transfer * * * [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Because actual intent may be difficult to prove, a creditor may establish a debtor's fraudulent intent when the circumstances demonstrate the badges of fraud set forth in R.C. 1336.04(B). *UAP–Columbus JV326132 v. Young*, 10th Dist. No. 09AP–646, 2010–Ohio–485, ¶29; *Blood v. Nofzinger*, 162 Ohio App.3d 545, 2005–Ohio–3859, 834 N.E.2d 358. The statutory list of badges of fraud includes, but is not limited to:

> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the debtor;
>
> (6) Whether the debtor absconded;
>
> (7) Whether the debtor removed or concealed assets;
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
>
> (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

The creditor need not demonstrate all the statutorily defined badges of fraud, and as few as three badges of fraud have been held to constitute evidence of actual fraudulent intent.

*UAP–Columbus* at ¶29. If the party alleging fraud is able to demonstrate a sufficient number of these "badges of fraud," the burden of proof shifts to defendant to prove that the transfer was not fraudulent. *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.* (1993), 87 Ohio App.3d 644, 650. The defendant can do so by demonstrating that the transfer was made in good faith and he was paid a reasonably equivalent value. Id. at 650-651; R.C. 1336.08(A).

Ohio courts have found that a transfer is concealed if it is not disclosed to the creditor. For example, in *Harrison v. Creviston*, 8th Dist. No. 86732, 2006-Ohio-3964, the court of appeals held that this badge of fraud applied because the debtor "concealed from the [creditors] his conversion and subsequent transfer of their funds to [third parties]." Id. at ¶ 21. Fraud must be established by clear and convincing evidence.

In order to prove that a transf er is fraudulent under R.C. 1336.04(A)(2), the debtor must have made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and either (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or (2) the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due. The defense of reasonably equivalent value given is an affirmative defense. *Permasteelissa* at *8. Accordingly, "[t]he person who invokes this defense carries the burden of establishing good faith and the reasonable equivalence of the consideration exchanged." Id., citing Uniform Fraudulent Transfer Act §8, cmt. 1(1984).

A transfer is fraudulent under R.C. 1336.05(A) if it is made after a creditor's claim has arisen, the debtor does not receive a reasonably equivalent value in exchange for the transfer, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. There are two definitions of insolvency in Ohio's Uniform Fraudulent Transfer Act:

> (1) A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation.
>
> (2) A debtor who generally is not paying his debts as they become due is presumed to be insolvent." R.C. 1336.02(A).

A transfer is defined as "every direct or indirect , absolute or conditional, and voluntary or

involuntary method of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." R.C. 1336.0(A)(4)(L). A claim is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

The Revised Code provides remedies against a transferee who has knowingly received the benefit of a fraudulent transfer. *Dolce v. Lawrence* (May 23, 1997), 11th Dist. No. 96-L-129. R.C. 1336.07 allows: (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; (2) attachment or garnishment against the asset transferred or other property of the transferee; or (3) application of the principles of equity including injunction against further disposition by the debtor or transferee, appointment of a receiver to take charge of the asset, or any other relief circumstances may require. That statute provides that, to the extent a transfer is voidable under section 1336.07(A)(1), the creditor may recover a judgment for the value of the asset transferred against either the first transferee of the asset or the person for whose benefit the transfer was made, or any subsequent transferee other than a good-faith transferee who took for value. R.C. 1336.08.

Fraudulent transfer actions are most commonly asserted against a transferee. "The statute is designed this way because the debtor is judgment-proof and the transfer was made to hide the property from the creditor in most fraudulent transfer cases, which is why the transfer is defined as fraudulent in the first place." *Esteco, Inc. v. Kimpel*, 7th Dist. No. 07CO30, 2007-Ohio-7201, ¶9.

As a consequence, Ohio courts have held that the transferee in a fraudulent transfer claim is a necessary and proper party:

> The text of R.C. 1336.07(A) and 1336.08(B)(1) thus suggest that the Ohio UFTA provides for remedies and judgments against the transferee of the property, making the transferee a necessary and proper party. Courts in Ohio, as well as those outside the state, have so held. See also *Esteco*, 2007-Ohio-7201, 2007 WL 4696855, at ¶ 8 (citing R.C. 1336.08 and stating that "[i]f a transfer is fraudulent, then a creditor has the right to sue the original transferee and any subsequent transferee for the value of the transferred property, subject to certain defenses"); *Dolce v. Lawrence* (May 23, 1997), 11th Dist. No. 96-L-129, 1997 WL 286154 (holding that "in an action involving the Ohio Uniform Fraudulent Transfer Act, the transferee is a necessary party over whom the court must possess personal jurisdiction in order to proceed"). See also *Simmons v. Clark Equip. Credit Corp.* (Ala.1989), 554 So.2d 398 (holding

> that the grantee, where it still retains title to the property, is a necessary party to an action by the grantor's creditors to set aside a conveyance as fraudulent); *Murray v. Murray* (Miss.1978), 358 So.2d 723, 725 (stating that the "grantee is a necessary party in an action to set aside a fraudulent conveyance").

*Brown Bark II, L.P. v. Coakley*, 188 Ohio App.3d 179, 186, 934 N.E.2d 991. The *Coakley* Court further recognized that the debtor is a necessary party, unless the debtor has conveyed its entire interest in the transferred property to the transferee. Id.

In addition to transferees, a creditor may also bring a fraudulent transfer action against "the person for whose benefit the transfer was made." R.C. 1336.08(B)(1)(a). Although the undersigned did not find any state court cases in Ohio analyzing the "transfer beneficiary" language in R.C. 1336.08(B)(1), at least one federal court interpreting Ohio law has addressed this issue. In *Permasteelisa CS Corp. v. Aerolite Co.*, 2007 WL 4615779 (S.D.Ohio 2007), the debtor corporation sold its assets and used the proceeds to pay off a corporate loan that was guaranteed by the president of the corporation. Permasteelia asserted a fraudulent transfer claim against the president of the debtor corporation and predicated recovery on R.C. 1336.08(B)(1). The *Permasteelisa* Court observed, "Although [the president] was not the first transferee, it could certainly be argued that the transfer was made for his benefit. He sought to sell [the debtor's] assets so that he could pay off the debt to People's Bank and avoid being personally liable on the loan. Moreover, the asset purchase agreement was conditioned on his continued employment." Id. *7, n. 3; see also *Reily v. Kapila (In re Int'l Mgmt. Ass'n*, 399 F.3d 1288, 1292-93 (11th Cir.2005)(paradigm case of a benefit under avoidance statute of the bankruptcy court is the benefit to a guarantor by the payment of the underlying debt of the debtor).

Hitachi dedicates virtually its entire brief in support of its motion for summary judgment to the piercing the corporate veil remedy. The parties disagree regarding the state law to be applied to the veil piercing remedy. Hitachi advocates the application of Ohio law and the Defendants advocate the application of Delaware law. However, regardless of the state law applied, Hitachi must demonstrate fraud on the part of the shareholders in order to pierce the corporate veil. *Glidden Co. v. Lumbermens Mut. Cas. Co.* (2002), 112 Ohio St.3d 470, 861 N.E.2d 109, paragraph one of the syllabus. (an actual conflict between Ohio law and the law of another jurisdiction must exist

-15-

before a choice-of-law analysis is taken in Ohio).

In Ohio, a court must apply the three-pronged test set forth in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, at paragraph three of the syllabus, as modified by *Dombroski v. Wellpoint, Inc.*, *supra*:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

Likewise, in Delaware, "[p]iercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice." *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del.Ch.1999). "Effectively, the corporation must be a sham and exist for no other purpose that as a vehicle for fraud." Id.

Accordingly, Hitachi must establish fraud in this case in order to invoke the veil piercing remedy. Hitachi's only reference to the fraudulent transfers claims in its motion for summary judgment is to "incorporate[ ]* * *by reference its previous briefing on the issue of fraudulent transfers" from its motion for preliminary injunction. (ECF Dkt. #284, Hitachi's Motion for Summary Judgment, p. 15.)

In the interim report and recommendation on the motion for preliminary injunction, the undersigned expressed confusion regarding Hitachi's analysis of the fraudulent transfers claims:

> Plaintiff's complaint and brief raise inconsistencies as to the manner in which Plaintiff is suing Defendants. Section 1336.08 of the Ohio Revised Code permits recovery of an asset from the transferee of a fraudulent transfer. In Counts II through VIII of the complaint, Plaintiff seeks to recover under this section, making it appear as though Plaintiff has sued Defendants as transferees. However, Plaintiff also alleges that Defendants are debtors because the judgment-debtors were merely Defendants' alter egos. ECF Dkt. # 41 at 8. This averment makes it seem as though Plaintiff is pursuing a different theory of recovery. Therefore, the instant complaint can be construed as raising two types of fraudulent transfer claims.

Despite the confusion noted by the undersigned, Hitachi made no effort to clarify its claims in its motion for summary judgment, choosing instead to incorporate by reference its fraudulent transfer arguments from the motion for preliminary injunction.

-16-

Hitachi asserts seven fraudulent transfer claims. The first three claims are predicated on the 2005 transfer of Horizon's assets by the Defendants to Med Fund. Hitachi claims that the 2005 transfer constitutes a fraudulent transfer pursuant to 1336.04(A)(1), 1336.04(A)(2) and 1336.05(A)(Counts II-IV). The second three claims are predicated on the numerous transfers by the Defendants to the shareholders in 2006, which Daniel characterized as repayment of short-term undocumented loans to Med Fund for payroll. Hitachi claims that the 2006 transfers constitute fraudulent transfers pursuant to 1336.04(A)(1), 1336.04(A)(2) and 1336.05(A)(Counts V-VII). The final claim is predicated upon the 2008 transfer of assets to Consolidated. Hitachi claims that the 2008 transfer constitutes a fraudulent transfer pursuant to 1336.04(A)(1)(VIII).

Hitachi appears to have alleged the fraudulent transfers claims in this case for the sole purpose of establishing the fraud element of the veil piercing remedy, without regard to the essential elements of its fraudulent transfer claims. While Hitachi may assert viable fraudulent transfers claims at trial, those claims have not been clearly articulated in the brief in support of the motion for preliminary injunction. Adding to the confusion, throughout Hitachi's brief in support of its motion for preliminary injunction, Hitachi presupposes veil piercing in its fraudulent transfer analysis. As a consequence, summary judgment on the fraudulent transfer claims is not warranted.

For instance, in its brief in support of the motion for preliminary injunction, Hitachi claims that the 2005 transfer of Horizon Medical's assets to Med Fund was a transfer to an insider. Hitachi reasons that "[b]ecause Defendants were persons in control of Med Fund at the time of the transfer, the transfer from Horizon [Medical] to Med Fund was a transfer to an insider. *See* R.C. 1336.01(G)(1)(d) (where debtor is an individual, as Defendants are, an insider is a corporation over which the debtor has control)." (ECF. Dkt. #41, Motion for Preliminary Injunction, p. 8.) Insiders are defined by their relationship to the debtor. The debtor in Count II is Horizon Medical, not the Defendants, and, therefore, R.C. 1336.01(G)(1), which defines "insiders" where the debtor is an individual, is inapplicable. With respect to Count V, Hitachi alleges that David (as the transferor) acted with actual intent to defraud Hitachi. Hitachi relies on several badges of fraud listed in R.C. 1336.04(B). Id. at p. 11-12. Hitachi appears to argue that David is the transferee, and David is an

-17-

insider of Med Fund. However, it is the transfer from Horizon Medical, the debtor in this case, to Med Fund that is the transfer at issue in Count V.

Furthermore, any analysis of the fraudulent transfer claims, as articulated in the brief in support of the motion for preliminary injunction, requires considerable speculation regarding the essential elements of the claims. For instance, Hitachi appears to allege that Med Fund was the transferee at issue in Counts II–IV. If Med Fund is the transferee, Med Fund is a necessary party, but Med Fund is not a defendant in this case. Hitachi does not allege that Med Fund is a successor corporation of Horizon Medical nor does Hitachi seek to pierce the corporate veil of Med Fund. Perhaps Hitachi seeks to recover from the Defendants in Counts II-IV as subsequent transferees, or transfer beneficiaries, or as alter egos of Horizon Medical, however its theory of liability and the law supporting that theory are impossible to discern from the brief in support of the motion for preliminary injunction. Of equal import, Hitachi fails to identify the value of the assets transferred from Horizon Medical to Med Fund in 2005. Damages in a fraudulent transfer action are limited to the amount of the assets transferred.

Because Hitachi has not proved the fraudulent transfer claims in this case as a matter of law in its motion for summary judgment. Moreover, to the extent that the fraudulent transfer claims are an element of the veil piercing remedy, summary judgment on piercing the corporate veil is not warranted. For the foregoing reasons, the undersigned recommends that the Court deny Hitachi's motion for summary judgment, (ECF Dkt #284), and deny as moot David's partial motion for summary judgment (ECF Dkt. #97).

IT IS SO ORDERED.

DATE: May 13, 2011           */s/ George J. Limbert*
                              GEORGE J. LIMBERT
                              UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).