UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS AMERICA, INC., | ) | CASE NUMBER: 5:09CV1575 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| DANIEL BRANCH, et al., | ) | **Interim Report and Recommendation Regarding Defendant Martin Kern's Partial Motion for Summary Judgment** |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

The above case is before this Court on a motion for partial summary judgment filed by Defendant, Martin Kern ("Kern").  (ECF Dkt. #81.) Kern filed a supplemental brief in support of the motion on February 15, 2011.  (ECF Dkt. #279.)  Plaintiff, Hitachi Medical Systems America, Inc. ("Hitachi") filed a response to the motion for summary judgment on March 15, 2011. ECF Dkt. #281.  Kern filed a reply on March 29, 2011.  (ECF Dkt. #291.)  With leave of court, Hitachi filed a surreply on April 13, 2011. (ECF Dkt. #303.)  For the following reasons, the undersigned recommends that the Court deny Kern's partial motion for summary judgment as it relates to piercing the corporate veil of Horizon Medical Group, Inc. ("Horizon Medical"), and grant the partial motion for summary judgment as it relates to the piercing the corporate veil of JFB Holdings, Inc. ("JFB Holdings").

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a). The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing that the nonmoving party, after adequate time for discovery, fails to show sufficient evidence to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. See *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir.1995).

In reviewing summary judgment motions, a court must view all facts and inferences drawn therefrom in a light most favorable to the nonmoving party. *Pachla v. Saunders Sys., Inc.*, 899 F.2d 496. 498 (6th Cir.1990). However, the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202). In other words, the court should determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251.

Hitachi is a Delaware corporation with its principal place of business in Twinsburg, Ohio. Hitachi sells and services Magnetic Resonance Imaging (MRI) equipment. Defendant Daniel Branch ("Daniel") was a shareholder and Chief Financial Officer of Horizon Medical at all times relevant to the complaint. Defendant David Branch ("David") was a shareholder and Chief Executive Officer of Horizon Medical at all times relevant to the complaint. Kern was a shareholder and officer of Horizon Medical at all times relevant to the complaint.

Horizon Medical is a management company that provided accounting, personnel, billing and collection services to numerous MRI centers owned and operated by numerous affiliated limited liability companies ("the LLCs"). (ECF Dkt. #285, Deposition of Daniel Branch (1/14/09), pp. 7-8.) The ownership of Horizon Medical was at all times relevant to the above-captioned case: David, 33%, Daniel, 20%, Kern, 15%, Barry Steinberg, 15%, Mike Brown, 7%, Dan Hansen, 7%, and Mike Lacenere, 3%. (ECF Dkt. #80-1, Affidavit of Martin Kern, ¶3.) The LLCs were owned by Med Fund, LLC and JFB Holdings. (ECF Dkt. #85, Deposition of Daniel Branch (May 15, 2008), p. 30.)

In addition to JFB Holdings' joint ownership of the LLCs with Med Fund, JFB Holdings also owned 65% of Med Fund. Id. at 30. The owners of the other 35% of Med Fund were not identified

-2-

in the record.  The ownership structure of Horizon Medical and JFB Holdings are identical, and, as a consequence, Defendants are majority shareholders of JFB Holdings.  Id. at 31.

In 2002, 2003, and 2004, Horizon Medical entered into four-year service agreements with Hitachi for the servicing and repair of the equipment at the various MRI centers.  (ECF Dkt. # 41-1, Affidavit of Richard Katz, ¶3.)  Beginning in 2004, Horizon Medical stopped paying the monthly service fees.  (ECF Dkt. # 41-1, Katz Aff. ¶6.)  On July 9, 2007, Hitachi filed a civil action asserting breach of contract,  unjust enrichment, and detrimental reliance claims against Horizon Medical and the LLCs, and a fraud claim against the Branches.  See *Hitachi Medical Systems America, Inc. v. Horizon Medical Group, et al.*, 5:07CV2035 (the breach of  contract/unjust enrichment case).  Hitachi alleged that the Branches fraudulently induced Hitachi to enter into the service contracts by misrepresenting Horizon Medical's ability to pay under the contracts.  Hitachi further alleged that, after Horizon Medical stopped paying the monthly service fees and Hitachi refused to perform under the contracts, the Branches fraudulently induced Hitachi to resume service.  Hitachi filed an amended complaint on November 29, 2007, which restated the claims in the original complaint, but also sought to pierce the corporate veil of Horizon Medical based upon the fraud claims asserted against the Branches.

On October 13, 2008, Judge Lioi entered summary judgment in favor of the Branches citing a failure on the part of Hitachi to demonstrate fraud.  (5:07CV2035, ECF Dkt. #191, Memorandum Opinion and Order, p. 24.)  It appears from the pleadings in that case that Hitachi believed that it could still pursue the veil piercing remedy based upon the breach of contract and unjust enrichment claims.  On October 29, 2008, Judge Lioi issued a memorandum opinion and order in which she concluded that the remaining claims in the amended complaint represented "basic example[s] of unjust conduct" and could not be used to justify piercing the corporate veil to permit Hitachi to pursue individual liability against the Branches.  (5:07CV2035, ECF Dkt. #216, Memorandum Opinion and Order, p. 5, quoting *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538.)  In *Dombroski*, the Ohio Supreme Court recognized that, in order to pierce the corporate veil, a plaintiff must demonstrate that "control over the corporation by those

to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity." *Dombroski, supra,* at paragraph three of the syllabus.

Despite the dismissal of the fraud claims against the Branches, Judge Lioi observed, in dicta, that a successful fraudulent conveyance claim could demonstrate the requisite fraud for the veil piercing theory of liability:

> In [Hitachi's] only colorable argument with respect to piercing the corporate veil, [Hitachi] argues that a veil-piercing claim could be appropriate if the Branches fraudulently transferred the Horizon entities' assets in order to avoid payment of creditors. A fraudulent conveyance claim, if successfully proved, likely could sustain a claim for piercing the corporate veil under [Ohio law.]

Id. at p. 5.[1] Hitachi raised the fraudulent conveyance allegations in a motion to compel discovery. Because Hitachi did not seek to amend its complaint to add a fraudulent conveyance claim, Judge Lioi ultimately denied the motion to compel because the discovery sought by Hitachi was not relevant to the remaining breach of contract and unjust enrichment claims. Id. at p. 7.

On November 10, 2008, Judge Lioi entered a judgment in favor of Hitachi and against Horizon Medical on the breach of contract claim in the amount of $2,823,783.80, and judgments in favor of Hitachi and against the LLCs totaling $462,375.71 ("the 2008 judgments"). (5:07CV2035, ECF Dkt. #251, 252.) The 2008 judgments remain unpaid. (ECF Dkt. # 41-1, Katz Aff. ¶12.)

---

[1]In *Waste Conversion Technologies, Inc. v. Warren Recycling, Inc.*, 141 Fed.Appx. 429, 2006 WL 2188709 (6th Cir.2006, unpublished), the Sixth Circuit observed that, in Ohio, fraudulent transfer claims "do not rise to the level required to pierce the corporate veil." Id. at 434. The Sixth Circuit reasoned:

> Fraudulent conveyance law is more carefully tailored to the interests of all parties than the blunt instrument of piercing the corporate veil, which, for instance, could permit recovery against the new party defendants beyond any amounts that were fraudulently transferred. The general remedy in a fraudulent conveyance permits the creditor to recover the value of the asset transferred or the amount necessary to satisfy the creditor's claim, whichever is less. See Ohio Rev.Code § 1336.08(B)(1). The remedy in fraudulent conveyance stands in contrast with the general remedy in veil piercing. When the corporation's veil is pierced, the individual shareholders are liable for all of the corporation's debts, which could exceed the value of the assets fraudulently conveyed. See *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 348 (7th Cir.2004) (shareholders are jointly and severally liable once the veil is pierced).

-4-

The complaint in this case was filed on July 9, 2009.  Hitachi asserts that Horizon Medical and the LLCs were rendered judgment-proof as a result of several fraudulent asset transfers executed "by and to the Defendants" between 2005 and 2008, and seeks to pierce the corporate veil of Horizon Medical and JFB Holdings[2] based upon the evidence of fraud, in order to recover the 2008 judgments personally from Daniel,[3] David, and Kern.  (ECF Dkt. #284, Hitachi's Motion for Summary Judgment, p. 3.)  Although Hitachi asserts that the Defendants controlled Med Fund and the LLCs, it is important to note that Hitachi does not seek to pierce the corporate veil of Med Fund, nor does it seek to pierce the corporate veil of the LLCs.

Hitachi discovered the lion's share of the following evidence, which it offers in support of the fraudulent transfers claims, during the examination of the judgment debtor, Horizon Medical, which was conduced during the post-judgment phase of the breach of contract/unjust enrichment case.  Daniel testified on behalf of Horizon Medical at the debtor's examination.

Pursuant to an agreement between Horizon Medical and the LLCs, Horizon Medical received a management fee equivalent to 20% of the monthly "net MRI revenue collected before expenses" generated by the MRI centers in exchange for accounting, personnel, billing, and collection services provided to the various LLCs.  (ECF Dkt. #285, Deposition of Daniel Branch (1/14/09), p. 56.)  The management fee constituted Horizon Medical's sole income.  Id. at p. 56.  From the management fee, Horizon Medical paid, among other things, the officers' salaries, and the LLCs' federal taxes.  Id. at p. 51, 53, 76-77.  Med Fund was a holding company for the LLCs.  Id., at p. 48.  Daniel explained that all of the insurance contracts were executed with Med Fund, so all of the money from the insurance companies would go to Med Fund.  Id. at p. 50.

---

[2]The Complaint reads, in pertinent part, "The corporate veils of Horizon [Medical] and JFB Holdings should be pierced, and Defendants should be held individually and personally liable for the fraud, illegal acts, and/or similarly unlawful acts, including all fraudulent transfers, alleged herein."  (ECF Dkt. #1, Complaint, ¶45.)

[3]On April 5, 2011, the Court entered default judgment on the fraudulent transfer claims against Defendant Daniel Branch and authorized Hitachi to pierce the corporate veil with respect to Daniel,  pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi), as a sanction for his willful failure to provide discovery throughout the pendency of this case.  (ECF Dkt. #295.)

-5-

As of January 14, 2009, the last federal tax return filed on behalf of Horizon Medical was for 2004.  Id. at p. 38.  In 2004, the MRI business suffered a downturn, which Daniel attributed to Hitachi and General Electric.  He claimed that Hitachi and General Electric had saturated the market with MRI machines, thereby driving down reimbursements.  Id. at p. 99.  Daniel alleged that Hitachi used the monthly maintenance service to surreptitiously determine the number of scan performed at each MRI center.  He further alleged that a pattern developed, where, if a particular MRI center generated a high volume of scans, a new MRI center would open nearby with Hitachi equipment.

Ten of the MRI centers owned by the LLCs were closed at some point in 2005.  According to Daniel, around the same time "we basically shut Horizon [Medical] down and then, you know, kind of streamlined the operations into Med Fund[4], you know, as the reimbursements continued to dip in the MRI business."  (ECF Dkt. #286, Deposition of Daniel Branch, p. 80, 82.)  Horizon Medical's management fee contract was canceled,  Id. at p. 82, and Med Fund assumed Horizon Medical's management responsibilities for the LLCs.  (ECF. Dkt. #285, Deposition of Daniel Branch,  p. 31.)  The management responsibilities assumed by Med Fund are not clear from the record, because Daniel stated that "[we]* * *outsourced a lot of our operations at that time.  We did outsource payroll.  We outsourced billing, anything to save money to try to keep it together."  (ECF. Dkt. #286, Deposition of Daniel Branch, p. 80.)  Adding to the confusion, neither of the Branch brothers nor Kern could identify the individual responsible for maintaining the corporate records for Horizon Medical.  (ECF. Dkt. #285, Deposition of Daniel Branch (1/14/09), p. 11.)

Despite "basically shut[ting] Horizon [Medical] down" in 2005, entries in the general ledger for the company, which was not offered as an exhibit for summary judgment purposes, continued through July 31, 2007.  (ECF. Dkt. #286, Deposition of Daniel Branch (2/18/09), p. 80. )  According to Daniel, the general ledger at issue "technically probably is Med Fund."  Id. at p. 83.  Daniel claimed that he was forced to reduce the accounting staff from ten to three at that time, and "well, such things as changing  the heading on the general ledger  just didn't get done."  Id. at p. 80-81.

---

[4]Hitachi does not allege that Med Fund is the successor of Horizon Medical.

He stated, "That's why I have to go back now and kind of clean up [Horizon Medical], and you know, get it all organized and finalized." Id. at p. 81.

When asked whether Med Fund assumed responsibility for Horizon Medical's financial obligations, Daniel responded, "No, because there wouldn't be because [Horizon Medical] was basically money in, money out. I mean, there wasn't any long term obligations on [Horizon Medical] except for the car leases – which they would assume – but other than that, the bills would have all been paid and [Horizon Medical's] book would all be closed." Id. at p. 83. The "car leases" refer to leases for a Lexus (Daniel), and two Porsches (David and Mike Brown), which Daniel characterized as "the one perk the officers did have is they made one – they had a car paid for." Id. at ¶86. He stated that not all of the officers took advantage of the perk. Id. at p. 87.

The car payments are reflected on Horizon Medical's general ledger. The ledger also reflects a $68,366.66 payment on January 24, 2006 to the Tampa Bay Buccaneers for a luxury suite, which Daniel claims was returned to the company the following year. Id. at p. 92. The ledger includes "large payments" to Cure, SE, a company which serviced the MRI machines after Horizon Medical breached their contracts with Hitachi, Id. at ¶94, and a $39,581.75 payment on February 1, 2006 to Jet Sales and Service, which Daniel claimed was not a debt of Horizon Medical or Med Fund. Id. at pp. 92, 96. It is not clear from the record whether the foregoing expenditures were debts of Horizon Medical or Med Fund or one or more of the individual shareholders.

Numerous payments to shareholders are also reflected in Horizon Medical's general ledger:

January 6, 2006:

-$110,000 to Martin Kern
-$15,000 to Daniel
-$10,000 to David
-$5,000 to Michael Lacenere

January 9, 2006:

-$10,000 to Daniel
-$10,000 to David

January 12, 2006:

-$80,000 to Martin Kern

-7-

> March 2, 2006:
>
> -$160,000 to Martin Kern

Id. at p. 90-98.

> March 6, 2006:
>
> -$10,000 to David
> -$70,000 to Kern
>
> March 13, 2006:
>
> -$5,000 to Mike Brown
> -15,000 to Daniel
> -$15,000 to David

(ECF Dkt. #286, Deposition of Daniel Branch (2/18/09),  pp. 96-97.)

Although Daniel conceded that "there was a lot of money in and a lot of money out at that particular time," he claimed that the foregoing transfers to shareholders constituted repayment of loans made by the shareholders to cover payroll expenses.  Id. at ¶56.  Daniel claimed that the loans were not memorialized because they were short term loans and "[y]ou would hopefully get the money back."  (ECF Dkt. #285, Deposition of Daniel Branch (1/14/09), p. 89.)

Based upon Daniel's testimony that Horizon Medical was shut down in 2005, and that any remaining Horizon Medical employees became employees of Med Fund, the short-term payroll loans would have been made to Med Fund, not Horizon Medical, but the "loan repayments" were made from the Horizon Medical ledger.  According to Daniel, the Horizon Medical ledger was the Med Fund ledger, which is consistent with his testimony that "the officers – if we could take anything out of Med Fund, we did; but usually we were putting money in there.  In the end, that's why we sold the company."  Id. at p. 82.

Daniel testified that Horizon Medical was not profitable, it lost money every year it was in business, and the company did not generate sufficient income to pay its obligations on a regular basis. Id. at p.¶8, 17-18, 38-39, 44.  According to Kern, Horizon Medical did not declare or pay dividends from 2004 to the present.  (Dkt. #281-3, Responses to Plaintiff's First Request for Admissions, First Set of Interrogatories, and First Requests for Production of Documents

Propounded upon Defendant Martin Kern, p. 8.)

On May 16, 2009, Consolidated Healthcare Services ("Consolidated") purchased the assets of the 31 LLCs for $13,821,000.  (ECF Dkt. #24-6, Asset Purchase Agreement ("APA"), p.  6 (SEALED).)  Hitachi claims that Consolidated also purchased the assets of Med Fund (and, therefore, the assets of Horizon Medical), but Med Fund is listed as an owner, not an asset seller, in the APA.  The owners identified in the contract were Med Fund, JFB Holdings, Davis Diagnostics, LLC, Horizon Crossings, LLC, David, and the other 30[5] LLCs. Id., p. 4, 34-46. The asset sellers identified were the 31 LLCs. However, according to Daniel, the insurance contracts that were negotiated with Med Fund were transferred in the APA. (ECF Dkt. #286, Deposition of Daniel Branch (2/18/09), p. 19.)

David negotiated the terms of the APA and signed the agreement on behalf of the owners. The APA provides several pre-conditions to closing, including consents and resolutions signed by Kern, David and Daniel "being (1) the authorized officers and directors of the Owners and (2) being the authorized managers or managing members of a majority interest of the Owners, approving this Agreement in form and substance satisfactory to the Purchasers."  (ECF Dkt. #24-6, Asset Purchase Agreement, p. 10. (SEALED)).

Although $11,321,000 of the purchase price was specifically earmarked in the APA for the satisfaction of debts to several financial institutions (GE Capital, $2,500,000; Lyon Financial Services, Inc., $4,500,000; CNL Bank, $937,000; Bank of Texas/Oklahoma, $384,000) as well as a debt to G&S, GP, LLC for $3,000,000, the potential debt to Hitachi was not acknowledged in the APA. Id. at p. 6.  According to Daniel, he and David were guarantors on one or more of the debts referenced in the APA, however, he did not identify the debts that he and/or David personally guaranteed. (ECF Dkt. #286, Deposition of Daniel Branch (2/18/09),  p. 21.) The remainder of the purchase price was divided into two payments: (1) $1,500,000 to the owners' legal counsel trust account for distribution to Med Fund, and (2) 1,000,000 to Med Fund ($100,000 per month for ten

_____

[5]Davis Diagnostics, LLC is listed as both an owner and an asset seller.

months following the closing date).

David received $490,000 by way of a wire transfer that was dated May 21, 2008.  (ECF Dkt. #107-7, Wire transfer to David Branch from Harry W. Haskins PA.)  Kern received $250,000 by way of a check written on Harry W. Haskins' trust account.  (ECF Dkt. #107-10, Check to Martin Kern from Trust Account of Harry W. Haskins PA.)  Hitachi alleges that Daniel received $350,000 by way of two wire transfers to one of his companies, KRB Enterprises, but did not cite to any evidence in the record to show that KRB Enterprises was owned by Daniel.  (ECF Dkt. #107-8, 107-9, Wire transfers to KRB Enterprises from Harry W. Haskins PA.)

The day before the APA was executed, Daniel provided deposition testimony in the breach of contract/unjust enrichment action, where he was asked if Horizon Medical was "currently operating."  (Dkt. #24-3, Deposition of Daniel Branch (May 15, 2008), p. 8.)  He responded, "Yes." Id.  He explained that Horizon Medical "manages all the centers, it gets a fee from the centers for management," and that he "handle[s] all financial activity for the company."  Id.  Daniel further testified that Horizon Medical had twenty-five employees, and that it provided "[t]ranscription, billing, collection, personnel, accounting, [and] overall management" for the MRI centers.  Id. at p. 21.

Judge Lioi concluded in the breach on contract/unjust enrichment action that Daniel's 2008 testimony constituted common law fraud.  In that case, Hitachi originally named Med Fund as a defendant.  Hitachi voluntarily dismissed Med Fund pursuant to Fed. R. Civ. P. 41(A)(1) with prejudice on November 6, 2008.  (ECF Dkt. #243.)  After Daniel's 2009 deposition, Hitachi filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b).  (ECF Dkt. #285.) Hitachi argued that it had voluntarily dismissed its claim against Med Fund based upon Daniel's fraudulent 2008 testimony that Horizon Medical was a going concern at that time.  Judge Lioi granted the motion for relief from judgment, writing:

> [Daniel] clearly misrepresented a material fact by claiming that [Horizon Medical] was operating as a going concern during 2008, when, in reality, it had ceased operations approximately three years earlier. This misrepresentation was made with the intention of inducing Hitachi's detrimental reliance – perhaps not for the specific purpose of obtaining a dismissal with prejudice of Med Fund (since that specific event was not a direct subject of conversation during Branch's 2008 deposition), but certainly for the purpose of obscuring the location of the Horizon Medical] entities'

-10-

assets and to trick Hitachi into pursuing the judgment-proof [Horizon Medical], rather than the asset-laden Med Fund.

(ECF Dkt. #290, Memorandum and Opinion, pp. 5-6.)

In his partial motion for summary judgment, Kern advances two arguments. First, Kern contends that there is no evidence that he exercised the dominion or control over Horizon Medical, and, therefore, he should not be personally liable for the corporate debt to Hitachi. Second, Kern argues that Hitachi has failed to produce any evidence in support of the veil piercing remedy as it applies to JFB Holdings.

The parties disagree regarding the law to be applied to the veil piercing remedy. Hitachi advocates the application of Ohio law and the Defendants advocate the application of Delaware law. However, regardless of the state law applied, Hitachi must demonstrate control on the part of the shareholders in order to pierce the corporate veil. *Glidden Co. v. Lumbermens Mut. Cas. Co.* (2002), 112 Ohio St.3d 470, 861 N.E.2d 109, paragraph one of the syllabus. (an actual conflict between Ohio law and the law of another jurisdiction must exist before a choice-of-law analysis is taken in Ohio). In Ohio, a court must apply the three-pronged test set forth in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, at paragraph three of the syllabus, as modified by *Dombroski v. Wellpoint, Inc.*, *supra*:

> The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

The first element is a restatement of the alter-ego doctrine, which requires that plaintiff show that the individual and the corporation are "fundamentally indistinguishable." *Belvedere*, 67 Ohio St.3d 274, 617 N.E.2d 1075, 1086. The degree of control required to pierce the veil in Delaware is "exclusive domination and control ... to the point that [the Corporation] no longer ha[s] legal or independent significance of [its] own." *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, Del. Ch., C.A. No. 11514, Allen, C., slip op. at 26, 1992 WL 127567 (May 28, 1992). "Simply phrased, the standard may be restated as: 'whether [the shareholders and the corporation] operated as a single

-11-

economic entity such that it would be inequitable for this Court to uphold a legal distinction between them.'" *Harper v. Del. Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1085 (D.Del.1990) (quoting *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, No. CIV. A. 8578, 1990 WL 44267, at *5 (Del.Ch. Apr.12, 1990)).

Kern argues that there is no evidence that he exercised any control over Horizon Medical to be held personally liable for the debts of the corporation.  Kern concedes that he was a shareholder of Horizon Medical from its inception in 1998, and a shareholder of JBF Holdings, Inc. ("JBF") from its inception, and that he was President of Horizon Medical from 1998 to 2000 or 2001.  ECF Dkt. #80-1, Kern Aff. ¶2.  Kern asserts that he became a senior vice president at Horizon Medical in 2000 or 2001, which he contends was "a job title, not a corporate officership. [sic]"  Id.  Kern further asserts that he never participated in the corporate decision making regarding corporate management, strategy, finances, allocation of resources, or sales of assets at Horizon Medical, JBF, or Med Fund, Inc.  Id. at ¶4.  He states that he did not have any involvement in the 2005 transfer or the 2008 transfer, and that he was unaware of the status of the companies' debt to Hitachi until the breach of contract/unjust enrichment  lawsuit was filed.  ECF Dkt. #80-1, Kern Aff. ¶7-8.  According to his affidavit, Kern's role with the companies was to develop employee training programs, and to train and monitor the sales and marketing employees of the MRI centers managed by Horizon Medical. Id. at ¶2.

Kern's affidavit reads, in pertinent part, "[w]hen the Companies' finances suffered a downturn beginning  in 2005, I was told that the Companies were having a problem covering the cost of payroll for the employees of the MRI centers that I managed.  I was asked to loan money to [Horizon Medical] on a short-term basis to fund the payroll.  I loaned money to [Horizon Medical] on a regular basis beginning in 2005, routinely loaning tens of thousands of dollars at a time.  Usually I was not asked to make another loan before the prior loan had been paid off in part or in full." Id. at ¶8.  Kern asserts that he is still owed $100,000 by Horizon Medical.  Id.

At a deposition conducted on March 21, 2007, for the purpose of the breach of contract/ unjust enrichment action, David stated that Kern's responsibilities at the companies were limited to sales and marketing.  (Dkt. #287, Deposition of David Branch, p. 32.) Likewise, Kern offered the

affidavits of Daniel and Michael Lacenere, wherein both  men stated that Kern's primary role with the companies was marketing and training.  (ECF Dkt. #278, Affidavit of Michael Lacenere, ¶4; ECF Dkt. #277, Affidavit of Daniel Branch, ¶4.)    Both men further stated that Kern did not dominate or control the management or decision making for the companies.  Id.  According to Lacenere, Kern's role as president of the company was largely titular and predicated upon his age (he was the oldest of the shareholders) and his "dignified appearance."  (ECF Dkt. #278, Affidavit of Michael Lacenere, ¶4.)  Daniel corroborated Kern's statements regarding his short-term and undocumented loans to Horizon Medical to cover payroll due to the financial downturn Horizon Medical suffered in 2005.  (ECF Dkt. #277, Affidavit of Daniel Branch, ¶5.)  Daniel further stated that Kern was not involved in the 2005 or the 2008 transfers, although he conceded that Kern "did ultimately approve the sale of the business in 2008, as did the other six owners. Id. at ¶6.  In his deposition, Daniel stated that Horizon Medical still owes Kern "a significant amount of money." (ECF Dkt. #281-2, Deposition of Daniel Branch (1/14/09), p. 97.)

Kern's assertion that he did not hold the position of President of Horizon Medical after 2000 or 2001 is directly contradicted by the record.  The For Profit Corporation Annual Reports for the years 1999 and 2004 to2007, and the Uniform Business Reports for the years 2000 to 2003, filed on behalf of Horizon Medical were offered by Hitachi in its opposition brief to Kern's partial motion for summary judgment.  (ECF Dkt. #121-1, Profit Corporation Reports.)  On every form, Kern is identified as the President of the company.  Kern is the signatory on the forms for the years 2006 and 2007.  Furthermore, Hitachi attached to its opposition brief a cease and desist order issued by the Alabama Securities Commission on November 8, 2005, which names Kern as the President of Horizon Medical.  (ECF Dkt. #281-5, Administrative order, p. 1.)

Kern argues that the corporate forms and administrative order are inadmissible for the purpose of summary judgment and should not be considered.  (ECF Dkt. #291, Reply brief, p. 3.) To the contrary, the revised civil rule of procedure only requires that Hitachi show that the material cited can be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). The 2010 amendment notes, read, in pertinent part, "Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be

admissible in evidence.  The objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Id.  In the surreply, Hitachi asserts that the evidentiary foundation will be established through witness testimony at trial. (ECF Dkt. #303, Surreply, p. 3.)  Accordingly, the undersigned recommends that Kern's objections should be overruled.

Kern offers his own affidavit, as well as the affidavits of other shareholders, in order to establish that he did not exercise the requisite control over the corporation to be personally responsible for its debts.  However, Kern's misrepresentations (whether they be in his affidavit or in the corporate forms filed from 2000 to 2007), coupled with the substantial transfers he received from the company in 2006, and, allegedly in 2008, create a genuine issue of material fact as to the level of control exercised by Kern at Horizon Medical.  Even if a fact-finder believes that the transfers made to Kern reflect the repayment of short-term loans, the substantial loans Kern made to the company belie his claims that he is just the sales and marketing representative, rather than a person who controlled the corporation.  Because a genuine dispute of material fact exist as to the extent of the control that Kern exercised over Horizon Medical, the undersigned recommends that Kern's motion for partial summary judgment be denied.

Next, Kern contends that Hitachi has failed to state a claim against JFB Holdings for corporate veil piercing.  Kern relies on the fact that Hitachi has no judgment against JBF Holdings.  Hitachi responds that "[JFB Holdings] was an instrumentality involved in the 2008 Transfer of the assets of  [Horizon Medical]/Med Fund and the Individual LLCs, and Kern and the Branch Defendants were shareholders, owners, and directors of JFB.  Kern cannot demonstrate that there are no genuine issues of material fact with regard to [Hitachi's] veil piercing remedy as to [JFB Holdings.]" (ECF Dkt. #281, Brief in opposition to Kern's motion for partial summary judgment, p. 21.

JFB Holdings has the same ownership structure as Horizon Medical, and JFB Holdings owned the  LLCs (with Med Fund) and was a 65% owner of Med Fund.  However, Hitachi has not produced any evidence to demonstrate that the Defendants are the alter egos of JFB Holdings or that

JFB Holdings engaged in fraud.

Like the control element, Ohio and Delaware have a similar test for determining whether the corporation is an alter ego of the shareholders in the veil piercing analysis.  Ohio courts consider such factors as:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 602 N.E.2d 685, 689 (6th Dist.1991). The District Court of Delaware in *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988) adopted a virtually identical test.  However, Hitachi has not offered any evidence of corporate improprieties on the part of JFB Holdings.  Furthermore, as Kern points out, JFB Holdings is not indebted to Hitachi.

Moreover, regardless of the state law applied, Hitachi must demonstrate fraud on the part of the shareholders in order to pierce the corporate veil.  In Ohio, control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity.  *Belvedere, supra*. Likewise, in Delaware, "[p]iercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice."  *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del.Ch.1999).  "Effectively, the corporation must be a sham and exist for no other purpose that as a vehicle for fraud."  Id.  Although JFB Holdings is identified as an owner in the APA, Hitachi has not offered any evidence to show that JFB Holdings engaged in any fraud in the 2008 transfer.

While JFB Holdings may be an instrumentality involved in the 2008 transfer, that allegation alone is insufficient to support the extraordinary remedy of piercing the corporate veil.  Accordingly, the undersigned recommends that the Court grant Kern's motion in part, as it relates to the veil piercing remedy against JFB Holdings.

For the foregoing reasons, the undersigned recommends that the Court deny Kern's partial motion for summary judgment as it relates to piercing the corporate veil of Horizon Medical, and

-15-

grant the partial motion for summary judgment as it relates to the piercing the corporate veil of JFB

Holdings. (ECF Dkt. #81.)

      IT IS SO ORDERED.

DATE: May 13, 2011                     */s/ George J. Limbert*
                                               GEORGE J. LIMBERT
                                               UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).